1
2
3
4
5
6                    UNITED STATES DISTRICT COURT

7                   NORTHERN DISTRICT OF CALIFORNIA

8  ANISSA JORDAN,                          No. C 10-5665 SI (pr)

9              Petitioner,                 **ORDER DENYING HABEAS
                                           PETITION AND DENYING
10                                         CERTIFICATE OF APPEALABILITY**

11     v.

12
   WALTER MILLER, Warden,
13
               Respondent.
14
   _____/
15

16                          **INTRODUCTION**

17        Anissa Jordan, a prisoner of the State of California, filed this habeas action under 28

18  U.S.C. § 2254 to challenge her state conviction.  This matter is now before the court for

19  consideration of the merits of the pro se habeas petition.[1]  For the reasons discussed below, the

20  petition is denied.

21

22                          **BACKGROUND**

23  I.    The Crimes

24        On December 2, 2005, the San Francisco County District Attorney charged Jordan and

25  co-defendants Greshinal Green, Lenora Robinson, and MacDonald Grady with murder,

26  attempted robbery, two counts of robbery, and conspiracy to commit robbery, along with

27  enhancements for the use of a revolver during the commission of the crimes; Jordan, Green and

28  _____

          [1] The matter was reassigned to this court on September 28, 2011.

1 Robinson were individually charged with possession of a firearm as ex-felons. Ans. Ex. E at 9-

2 10.

3     The California Court of Appeal set out the facts:

4     ***The Robbery of Alston and Holmes***

5         At approximately 11:30 p.m. on Saturday, May 14, 2005, Almondo Alston and his

6     friend, Floyd Holmes, parked Alston's car at the corner of Turk and Leavenworth Streets
      in San Francisco. The two men planned to go to Club 181,[2] located at Eddy and Taylor
      Streets. Alston testified that they came with a woman he knew only as "Pooh." Holmes

7     said that the two men drove to the area alone but recalled Alston talking to a woman
      when they got out of the car.

8
9         Alston testified that as they were walking down Leavenworth toward Eddy Street,
      two women approached the men from behind, and one of the women asked them if they
      had "E-tabs" or "X-tabs," or "something like that." Holmes described the woman who

10    asked "About E-tabs or something" as having blonde braids. Alston thought the woman
      was asking for the drug "Ecstasy," and either he or Holmes told her that they had none.

11    Alston described one of the women as dark-skinned, about five feet eight or nine inches
      tall, and wearing a red, black, and green knitted "Rasta" hat. The other woman was light-

12    skinned and approximately five feet ten inches to five feet eleven inches tall. Alston
      identified the shorter, dark-skinned woman as appellate Robinson and the taller, light-

13    skinned woman as appellant Jordan.

14        According to Alston, after he and Holmes left the two women and continued
      walking, a man approached them from behind. Alston turned around, and a man whom

15    Alston later identified as Green pointed a black revolver at Alston's chest area. Alston
      described the gunman as having "nappy hair" or perhaps "little braids." Green ordered

16    Alston to lie down. Alston complied because he "didn't want to get shot," and he lay face
      down on the sidewalk. He then heard Green tell Holmes to get on the ground, and Holmes

17    did so. Pooh, who was walking ahead of Alston and Holmes and was almost at the end
      of the block, was not involved in the incident.

18
19        Alston said one of the two women, Robinson, was directly involved in the robbery,
      and he thought "the taller woman" (Jordan) was further up the street with Pooh. Alston

20    testified that Robinson told him and Holmes to stay down and not to move. She then went
      through Alston's pants and jacket and took his car keys and about $90 in cash. After

21    Robinson went through his pockets, she and Green "took off in [the] opposite direction"
      back toward Turk Street.

22        Holmes testified that he was robbed, but he was unable to recall what happened
      in detail and said repeatedly that he "didn't see nothing." According to Holmes, a man

23    came up from behind him and put a gun to his head. Afraid for his life, he got down on
      the ground. His keys, cell phone, and $93 were taken from him, and a chain was snatched

24    from around his neck. Holmes could not say whether the robbers went through his
      pockets. He testified that he had no idea who had robbed him, but he recalled seeing a red

25    hat on one of the robbers as they left.

26        According to the Alston testimony, after the incident he and Holmes headed back

27    _____

28        [2] In the record, the establishment is referred to as "Suite 181."

2

to Alston's car along with Pooh, who had rejoined them. They did not go to the police to report the robbery. Five or ten minutes later, Alston heard sirens, and the group started walking towards Eddy and Jones Streets.

### The Attempted Robbery and Murder of Garvin

At approximately 11:45 p.m. on that same evening, Alexander Crispi was in a parked "party bus" on Taylor Street that he and others had taken to Club 181. Crispi and his companions had been drinking, and Crispi had consumed seven to nine "swigs" or "shots" of Jack Daniels whiskey. Crispi said he was "a little bit buzzed" but that he could "hold [his] own."

Crispi was looking out of the window of the bus and, from a distance of 25 to 30 feet, he saw a man walking north on Taylor and two men walking south on Taylor. One of the two men walking south was wearing a light-colored, hooded jacket with a fur collar, and the other, who had short dreadlocks or braids and facial hair, was wearing a black, puffy jacket with a hood. Crispi identified the latter man as Green. Crispi testified that "[i]t looked like the two gentlemen that were walking south were trying to block the gentleman that was walking north." The two men "kind of pushed the one gentleman back as he was trying to walk up Taylor." Crispi watched for perhaps five or ten seconds, and he thought that an argument or "an altercation, maybe a fight, like a drug deal," was going on. He saw Green pull out a gun and shoot, from point-blank range, the man who had been walking northbound. Crispi described the gun as a silver or black chrome revolver. The victim, later identified as Garvin, fell to the ground after being shot, and Crispi saw Green reach into Garvin's left pocket before Green and his companion "took off running south." Crispi lost sight of them. He estimated that the entire incident took between 10 and 30 seconds.

Gail Gatan also witnessed the attempted robbery and shooting of Garvin on the evening of May 14, 2005. On that evening, Gatan, her fiancé, and some friends came to San Francisco to celebrate Gatan's birthday at Club 181. Gatan and her fiancé were in a car waiting to pull into a parking lot on Taylor Street when Gatan looked out the window and saw an altercation. There were three people across the street, "the victim and two other people." The victim was a African-American male with dreadlocks, and he was arguing with two other people who "looked like two... black males." Gatan testified that one of the two other people was wearing a red hat or beanie with some hair sticking out, and the other was "heavier set, a little more stockier," with braided hair. At trial, Gatan identified the person with the red hat that she had originally thought was a male as Robinson and the second person as Green.

Gatan testified that she saw the three people shoving one another and then she heard a single gunshot. After hearing the gunshot, Gatan saw the victim fall to the ground and heard him "kind of groaning." She saw the man she identified as Green kneel down and grab the victim, "as if he was reaching down for something." Robinson was farther away from the victim and got a head start running down Taylor. Green followed Robinson as the two ran toward Turk Street, where they turned, and Gatan lost sight of them.[3]

---

[3] At trial, Gatan admitted to a number of inconsistencies in the various accounts she had given of the shooting. She first gave a statement to police approximately three to three and one-half hours after the incident. In the statement, Gatan incorrectly described the victim's clothing as the clothing worn by one of the perpetrators. She initially told the police that she had heard "gunshots," but at trial she testified she "just remember[ed] one." She conceded that at different

1

2        The Oshun Center, located at 101 Taylor Street, had security cameras working on
the evening of the incident. Videos taken by those cameras showed, at approximately

3    11:41 p.m., Green and Robinson walking to the intersection of Turk and Taylor Streets
and turning northbound onto Taylor. The video then showed Garvin, and later showed

4    Green and Robinson back at the intersection of Turk and Taylor "in kind of quickened
walk." Shortly, after that, the video showed a police car crossing the intersection of Turk

5    and Taylor toward Green and Robinson as the two walked westbound on Turk Street. The
video then displayed a police car driving northbound on Taylor with lights and sirens on.

6        An assistant medical examiner testified that Garvin died of a single gunshot that
entered his body at the left collarbone or clavicle and then lodged in his right chest cavity.

7    On the ground near Garvin's body, police found a cell phone with a $5 bill clipped to it.

8    ### The Arrest and Identification of Appellants

9        Officer Theresa Sangiacomo testified that she was on patrol in the Tenderloin on
the evening of May 14, 2005. At about 11:45 p.m., Sangiacomo and her partner were

10   stopped at the intersection of Turk and Taylor Streets when she saw two people running
south on Taylor. The officer initially believed that the two people were African-American

11   males. The first was a taller male wearing a dark blue hooded sweatshirt, while the
second was shorter and wearing a "red floppy hat beret."

12

13       Sangiacomo said that as the two individuals neared the corner, they appeared to
look at the officers in the police car and then slowed their pace to a fast walk. The two

14   people reached the corner of Turk and Taylor and turned  westbound on Turk. When the
officers moved their car to get a better look at the two, police dispatch sent out a

15   broadcast that a person had been shot at 145 Taylor Street. The broadcast described the
suspects as two African-American males, and Sangiacomo specifically recalled that it

16   mentioned "a red hat, possibly a beret."

17       Sangiacomo could no longer see the two people she had observed running and
believed that they were hiding, so she directed her partner to back their patrol car up. The

18   officers turned their spotlights on, and they saw a white, four-door Toyota Camry that had
been parked at the curb start to enter traffic. The officers turned on the patrol car's

19   overhead lights and siren, and the Camry pulled over to the side of the street. Inside the
Camry, the officers saw the two people whom they had observed on foot - Green,

20   _____

21   times between her statement on the night of the incident and her later preliminary hearing
testimony she had variously described "the person in the red beanie" as sometimes smaller and

22   sometimes larger than the other perpetrator. In a second statement she gave police before the
preliminary hearing, Gatan told police that both of the suspects had taken things from the victim.

23       Gatan also admitted that she had testified differently on some matters at the preliminary
hearing. There, she had testified Green was the person who was wearing the red hat, while at

24   trial she testified that Robinson wore the red hat. At trial, she incorrectly claimed that at the
preliminary hearing she had identified Robinson as the person wearing the red hat. Later in her

25   trial testimony, however, she admitted that at the preliminary hearing she had said that Robinson
was definitely *not* the person in the red hat. She also admitted to her confusion over the gender

26   of the person wearing the red hat. Gatan testified at trial that she initially thought the two
individuals who fled the scene were men. She acknowledged that at the preliminary hearing she

27   had identified Grady as the person who kneeled over the victim and had identified Green as the
person in the red hat, because she had expected to identify two African-American males, and

28   Grady and Green were the only two African-American men in the courtroom wearing orange.

United States District Court
For the Northern District of California

wearing a sweatshirt, Robinson, in a red hat, as well as two others, later identified as codefendant Grady and appellant Jordan. Robinson was in the front passenger seat, and Green was behind her "slouched or hunched" in the back seat. Grady was driving the Camry, and Jordan was seated behind him.

Numerous other police cars arrived to assist the officers, and appellants were ordered to get out of the car one at a time. The police then proceeded to conduct "cold show" identifications involving appellants.[4] Police brought Crispi to the intersection of Turk and Jones. Crispi told police that the shooter had dreadlocks, and after being shown four or five individuals, Crispi pointed out two suspects but identified only Green as possibly being the man who shot Garvin.

Alston testified that about five or ten minutes after he and Holmes were robbed, they heard sirens and he, Holmes, and Pooh began walking toward the sound of the sirens. At Turk and Jones, they saw some people in a Camry and watched police pull three of them out of the car. Alston said he and Holmes told the police they had been robbed and "probably" told police "[w]e think these are the people who robbed us." According to Alston, he and Holmes stood together and identified Green, Jordan, and Robinson as their robbers. For his part, Holmes recalled going to Jones and Turk after the robbery, but he said he did not speak to the police, only Alston did.

Sangiacomo testified that during the lineup procedures, she secured the Camry and no one entered the car. Officer Nicholas Ferrando, who assisted with the felony traffic stop, testified that he eventually searched the Camry after the passengers were removed. Ferrando saw a handgun under the driver's seat, but he did not touch it and only notified his lieutenant of its presence. Officer Jason Garden, who also searched the Camry, checked the passenger side of the car, looked under the seat, and "saw what appeared to be definitely a gun, but possibly two guns...." When the police completed the field identification procedures, the Camry was towed to a secure impound facility.

### Police Interview of Alston and Holmes

The police interviewed Alston and Holmes at the Tenderloin police station. According to the interviewing officer, Alston may have said that it was dark during the robbery and initially said he did not recognize anyone, but he later said he had seen the perpetrators in a car after the incident. Holmes told the police at least three times that one of the robbers had put a gun to his head. Holmes also told the police that it was the person in the red hat who had actually gone through his pockets and that the man with the gun had told the person in the red hat, "Make sure you got everything."[5]

---

[4] As explained at trial, in a "cold show" witnesses to the incident are brought by the police to view certain individuals so that the witnesses can state whether or not the individuals were involved in the crime.  (See *United States v. Diaz* (N.D. Cal. Oct. 30, 2006, No. CR 05-0167 WHA) 2006 WL 3086732, p. *2 [term "cold show" denotes "an informal identification lineup conducted in the field"].)

[5] In his trial testimony, Holmes said he could not recall telling the police that the armed man had made this statement to the person in the red hat. Holmes also could not remember telling the police that it was the girl with the red beret who had gone through his pockets and taken his property, including his cell phone. He testified that he could not recall telling the police that "the red hat girl, was like the main one" or that "it was the man [who] snatched the chain off [his] neck."

5

1

2          On May 25, 2005, the police interviewed Holmes again. When he was shown a
photograph of a red make-up bag belonging to Jordan, Holmes told the police it was the
3   bag that the "gold braids girl" had during the robbery. A photograph of appellant Jordan,
taken the evening of her arrest, showed her with gold braids.

4
### Search of Appellants and Recovery of Evidence

5          The police searched appellants and their property. In Green's possession, the
police found Holmes's keys, a "Reportee Follow-up" form belonging to Holmes, other
6   items, and $3.05 in cash. In a purse that Jordan had acknowledged was hers, police found
a number of items, including Holmes's chain, the clasp of which was broken, as well as
7   four gold rings, three silver earrings, and two other chains. Robinson was found with
$342.18 and a red hat.

8          In the Camry, police found a Smith & Wesson .38-caliber special revolver under
the rear of the driver's eat. The Smith & Wesson contained four live .38 caliber
9   cartridges, one fired casing, and one empty chamber. A police inspector testified that
because the gun's hammer was resting on the empty cartridge, he could determine that
10  the last thing that had happened with the gun before it was found was that a bullet had
been fired from it. Under the front passenger seat of the Camry, the inspector found a
11  Beretta .22 caliber semiautomatic pistol with three live cartridges in its magazine. Also
in the car were a purse, clipboard, and two cell phones, one of which belonged to Holmes.

12
### Testing of Physical Evidence

13
           The police swabbed and tested the guns and cell phones for the presence of DNA
14  evidence. Testing revealed that the .38 caliber Smith & Wesson revolver had DNA from
two individuals on the handles, consistent with Green and with Jordan. The two
15  contributors could not be distinguished from each other. The DNA profile on the Smith
& Wesson occurred in approximately one in 352,000 Caucasians in the United States, one
16  in 186,000 African-Americans, one in 304,000 California Hispanics, and one in 1.7
million Asians.

17
           The Beretta also had DNA evidence on it, and Robinson was identified as a
18  potential source. The DNA profile from the Beretta swab occurred in approximately one
in 596 trillion Caucasians in the United States, one in 14 trillion African-Americans, one
19  in 40 trillion California Hispanics, and one in 1 quadrillion Asians.

20         Ballistics testing of the Smith & Wesson determined that it was the weapon used
to kill Garvin.
21
           Gun residue tests performed on appellants and Grady yielded no residue. Gunshot
22  residue bags were placed on Green's hands on three occasions, but Green succeeded in
tearing the bags at least twice.
23
Cal. Ct. App. Opinion, ¶¶. 2-9 (footnotes renumbered); Ans. Ex. E.
24

25

26  II.    Procedural History

27         On June 28, 2006, Jordan was acquitted of attempted robbery, but found guilty of first

28

6

degree murder (Cal. Penal Code § 187),[6] two counts of robbery (§ 212.5(c)), one count of conspiracy to commit robbery (§ 182(a)(1)), and one count of possession of a firearm after having been previously convicted of a felony (§ 12021(a)).[7]  The jury also found true the allegations that Jordan was armed with a revolver during the commission of the murder and robberies (§ 12022(a)(1)).  Ans. Ex. B at 2474-2511.

In a bifurcated proceeding, the trial court found true an allegation that Jordan had served a prior prison term (§ 667.5(b)).  Ans. Ex. B at 2534-35.  On December 11, 2006, Jordan was sentenced to 27 years to life in state prison.  Id. at 2560-64.

On August 26, 2009, Jordan's conviction was affirmed by the California Court of Appeal. The state appellate court also denied Jordan's petition for a writ of habeas corpus.  On December 2, 2009, her petitions for review of the direct appeal and habeas petition were denied by the California Supreme Court.

Jordan then filed this action on December 13, 2010.  In her petition, Jordan asserted eight claims that the court found cognizable and ordered respondent to answer: 1) there was insufficient evidence to support the first degree murder conviction; 2) the trial court gave inadequate jury instructions with respect to the conspiracy to commit robbery charge; 3) the jury instructions with respect to co-conspirator liability in felony murder were misleading and ambiguous; 4) the jury instructions on the "natural and probable consequences theory of liability" were erroneous; 5) the trial court erred when it refused to give instruction that jurors must agree unanimously "on all facts required for co-conspirator liability in felony-murder"; 6) the trial court erred when it refused to instruct on defense theory; 7) ineffective assistance of counsel for failure to make sufficient argument on jury instructions; and 8) ineffective assistance of counsel for failure to object to jury instructions.  Pet. at 6-6B.  The court issued an order to show cause on April 29, 2011.

---

[6] Unless otherwise specified, further statutory references are to the California Penal Code.

[7] Defendant Grady was acquitted of all charges, and defendants Green and Robinson were convicted along with Jordan on the murder, robbery, conspiracy, and firearms possession counts. Convicted defendants filed a joint appeal.

Respondent filed an answer to the petition. Jordan filed a traverse. The case is now ready for review on the merits.

### JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns a conviction obtained in San Francisco County, which is in this district. <u>See</u> 28 U.S.C. §§ 84, 2241(d).

### EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. <u>See</u> 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

### STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

## DISCUSSION

I.    Due process claim based on insufficient evidence

Jordan claims that there was insufficient evidence to support the first degree murder conviction based on the theories of liability presented by the prosecution.  Jordan claims that she "was not the perpetrator of the shooting, which allegedly occurred during an attempted robbery," that she "was blocks away in a car," and that there "was no substantial evidence that she committed a requisite act or had the intents required for aider and abettor or co-conspirator liability in first degree murder."  Pet. at 6.

The California Court of Appeal described the background of this claim as follows:

> Both Jordan and Robinson contend the first-degree murder verdicts against them are not supported by substantial evidence. Although both appellants base their claims on the alleged insufficiency of the evidence, their arguments differ. We will outline each appellant's particular arguments and analyze them separately.

> A.    *Standard of Review*

> In reviewing appellants' challenges to the sufficiency of the evidence, we do not determine the facts ourselves. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129.) Instead, our task is to examine the whole record in the light most favorable to the judgment and to discern "whether it discloses substantial evidence - evidence that is reasonable, credible and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*Ibid.*) Thus, "'[t]he test on appeal is

whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. [Citation omitted.] The appellate court must determine whether a reasonable trier of fact could have found [that] the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.'" (*People v. Johnson*, *supra*, 26 Cal.3d at p. 576.) The standard of review is the same in cases in which the People rely primarily on circumstantial evidence. (*People v. Guerra*, *supra*, at p. 1129; *People v. Bean* (1998) 46 Cal.3d 919, 932.) If we determine that a rational jury could find the essential elements of the crime proven beyond a reasonable doubt, this satisfies the due process clauses of both the federal and California Constitution. (*People v. Memro* (1995) 11 Cal.4th 786, 861.)

In conducting our review, we must bear in mind that it is the jury's role to determine the credibility of witnesses and the truth or falsity of the facts upon which a determination depends. (*People v. Barnes* (1986) 42 Cal.3d 284, 303.) We may not substitute our judgment for that of the jury, and if the evidence reasonably supports the jury's findings, we may not reverse the judgment merely because we believe that the evidence might also support a contrary finding. (See *People v. Ceja* (1993) 4 Cal.4th 1134, 1139.) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Bean*, *supra*, 46 Cal.3d at ¶. 932-933.)

B.   *Jordan*

Jordan asserts that the trial court instructed the jury on only two theories of liability for first-degree murder - "an aiding and abetting, natural and probable consequences theory and coconspirator/aiding and abetting liability for felony murder." She claims first that there is insufficient evidence from which a jury could conclude that Green committed a premeditated and deliberate murder of Garvin. Jordan then argues that the People failed to present sufficient evidence of her intent to sustain a conviction under either a coconspirator liability theory or an aiding and abetting theory. She concedes that the evidence "at least arguably raises an inference that [she] had knowledge that Green was most likely going to attempt to commit another robbery after the robbery of Alston and Holmes," but contends that there was no substantial evidence that she intended to agree that Green commit additional robberies and intended that her coconspirators commit more robberies. Jordan contends "the prosecution had to prove that [she] either agreed to commit an additional robbery after the Alston/Holmes robbery and intended that it be committed (for coconspirator liability) or had knowledge that Green was going to commit another robbery and intended to aid and abet it (for aiding and abetting liability)." In her view, the evidence does not suffice to support a finding of the requisite intent.

Cal. Ct. App. Opinion, ¶. 35-36.

The California Court of Appeal rejected Jordan's argument that there was insufficient evidence to support the first degree murder conviction:

Contrary to Jordan's assertions, we conclude there was substantial evidence to support a finding that she was a member of a conspiracy to commit robberies, including the attempted robbery of Garvin, and that she intended that one or more members of the conspiracy commit the robbery of Garvin. On the evening of May 14, 2005, a man and two women robbed Alston and Holmes. The robbery victims testified that as they were walking towards Eddy Street on Leavenworth in San Francisco, two women, one of

whom had gold braids, walked up and asked for "E-tabs or something like that." Alston identified Jordan as one of the women, and a photo of Jordan taken after her arrest showed that she had gold braids. The other woman was identified as Robinson, and the man as Green. During that robbery, Holmes's chain was stolen, and it was later found in Jordan's handbag when she was arrested. The attempted robbery and murder of Garvin occurred at Taylor Street and Eddy Street within approximately fifteen minutes, and approximately two blocks, of the robbery of Alston and Holmes. Jordan was apprehended moments later, within a block of the Garvin shooting, in a vehicle fleeing the scene and in the company of the two individuals (Green and Robinson) identified in the Garvin confrontation. The gun used to rob Alston and Holmes and to kill Garvin was found under the driver's seat of the Camry in front of where Jordan was seated, and DNA found on the gun matched Jordan's.

From this evidence the jury could certainly have concluded that Jordan was part of a group which had conspired to commit robberies on the evening of May 14, 2005. (See *People v. Jones* (1986) Cal.App.3d 509, 517 [proof of assent to conspiracy must usually be inferred from facts and circumstances].) She participated directly in the robbery of Alston and Holmes, helping to divert their attention so that Green could approach the victims unnoticed. The cooperation between Jordan and her two confederates permitted the jury to infer that the robbery was preplanned. Because Green and Robinson then immediately set out to commit another robbery while Jordan returned to the getaway car with some of the stolen property, the jury could reasonably conclude that Jordan was not only aware that another robbery would be committed, but that she agreed that it would be committed and intended that her accomplices commit it. The commission of multiple offenses is in no way inconsistent with the existence of a single overall agreement. (*People v. Vargas* (2001) 91 Cal.App.4th 506, 553-554.) As the gun used to kill Garvin was found under the car seat in front of Jordan and had DNA matching hers on it, the jury could have concluded that she had agreed to conceal the weapon as the group attempted to escape.[8]

Cal. Ct. App. Opinion, ¶. 36-38.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, see Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324. See, e.g., Wigglesworth v. Oregon, 49 F.3d 578, 582 (9th Cir. 1995) (writ granted where Oregon procedure of allowing lab reports regarding drug analyses

---

[8] Jordan's arguments in opposition all view the evidence in a light favorable to her. We are required, however, to view the evidence in the light most favorable to the verdicts. (E.g., *People v. Guerra, supra,* 37 Cal.4th at p. 1129.) For purposes of our review, it does not matter that other, perhaps equally reasonable conclusions might be drawn from the evidence. (See *People v. Bean, supra,* 46 Cal.3d at p. 933.)  (Original footnote renumbered.)

United States District Court
For the Northern District of California

to be admitted into evidence without authenticating testimony relieved state of its burden to prove beyond reasonable doubt all elements of crime charged); <u>Martineau v. Angelone</u>, 25 F.3d 734, 739-43 (9th Cir. 1994) (writ granted where evidence found insufficient to convict defendants of child abuse based on delay in seeking medical care for child).

A federal court reviewing collaterally a state court conviction, as in the case at bar, does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. <u>Payne v. Borg</u>, 982 F.2d 335, 338 (9th Cir. 1992), <u>cert. denied</u>, 510 U.S. 843 (1993). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" <u>Id.</u> (quoting <u>Jackson</u>, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. <u>Jackson</u>, 443 U.S. at 324; <u>Payne</u>, 982 F.2d at 338; <u>Miller v. Stagner</u>, 757 F.2d 988, 992-93 (9th Cir.), <u>amended</u>, 768 F.2d 1090 (9th Cir. 1985), <u>cert. denied</u>, 475 U.S. 1048, <u>and cert. denied</u>, 475 U.S. 1049 (1986); <u>Bashor v. Risley</u>, 730 F.2d 1228, 1239 (9th Cir.), <u>cert. denied</u>, 469 U.S. 838 (1984).

Viewing the evidence here in the light most favorable to the prosecution, it is clear that a rational trier of fact could have found that Jordan had the intent required to be liable as a co-conspirator. The state court found that there was "substantial evidence" to support the conviction: Jordan was identified as one of three people who robbed Alston and Holmes on the evening of May 25, 2005; Holmes's stolen chain was found in Jordan's handbag when she was arrested; the attempted robbery and murder of Garvin occurred within fifteen minutes and approximately two blocks of the robbery of Alston and Holmes; Jordan was apprehended moments later, within a block of the Garvin shooting in a vehicle fleeing the scene; she was in the company of the Green and Robinson who were identified in the Garvin confrontation; the gun used in the robberies and murder was found under the driver's seat of the Camry in front of where Jordan was seated; and DNA found on the gun matched Jordan's. <u>See</u> <u>supra</u> at 11. Furthermore, circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995). Mere suspicion

12

United States District Court
For the Northern District of California

1    and speculation cannot support logical inferences, however. Id.[9] Here, the state court found that

2    there were permissible inferences which could lead a rational jury to conclude that Jordan was

3    part of a group of people who conspired to commit multiple robberies during a single night: the

4    fact that she participated directly in the robbery of Alston and Holmes by helping to divert their

5    attention so that Green could approach the victims unnoticed permitted the jury to infer that the

6    robbery was preplanned. See supra at 11. The state court also concluded that "because Green

7    and Robinson then immediately set out to commit another robbery while Jordan returned to the

8    getaway car with some of the stolen property, the jury could reasonably conclude that Jordan

9    was not only aware that another robbery would be committed, but that she agreed that it would

10   be committed and intended that her accomplices commit it." Id. Jordan's assertions that she was

11   not the shooter and that she was not present during the shooting are irrelevant with respect to the

12   jury's finding that she was part of a conspiracy to commit multiple robberies based on more than

13   mere suspicion or speculation; the jury reasonably inferred that Jordan knew and agreed to Green

14   and Robinson committing another robbery by her involvement in the first robbery, and then her

15   waiting in the getaway car and concealing the murder weapon after the second robbery. Id.

16        Jordan is mistaken with respect to her belief that Jackson requires the evidence show guilt

17   to a "near certitude." Doc. 2 at 9. On the contrary, only if *no* rational trier of fact *could have*

18   found proof of guilt beyond a reasonable doubt, has there been a due process violation. Jackson,

19   443 U.S. at 324 (emphasis added). As respondent correctly points out, the court need only be

20   convinced that "it was objectively reasonable for the state court to conclude that a rational jury

21   could have concluded, based on the evidence, that [Jordan] either agreed to commit an additional

22   robbery after the Alston/Holmes robbery and intended that it be committed (for coconspirator

23   liability) or had knowledge that Green was going to commit another robbery and intended to aid

24

25

26        [9] Compare United States v. Begay, No 673 F.3d 1038, 1043-1044 (9th Cir. 2011) (en
     banc) (evidence about defendant's activities and the manner of killing allowed inference of
     premeditation and is sufficient "because it is 'supported by a chain of logic,' which is all that is
27   required to distinguish reasonable inference from speculation") with Juan H. v. Allen, 408 F.3d
     1262, 1278-79 (9th Cir. 2005) (granting writ where, after resolving all conflicting factual
28   inferences in favor of prosecution, only speculation supported petitioner's conviction for first
     degree murder under a theory of aiding and abetting).

and abet it (for aiding and abetting liability)."

Jordan also incorrectly attempts to present the evidence in a light most favorable to her defense. Review on habeas requires the federal court to view the evidence "in the light most favorable to the prosecution." Payne, 982 F.2d at 338 (quoting Jackson, 443 U.S. at 319). This includes resolving conflicting inferences in favor of the prosecution, Jackson, 443 U.S. at 326.[10] In fact, *all* of the evidence admitted at trial must be viewed in light most favorable to the prosecution. See McDaniel v. Brown, 130 S. Ct. 665, 673-74 (2010) (emphasis added) (finding 9th Circuit erred by failing to consider all of the evidence in light most favorable to the prosecution when it resolved inconsistencies in testimony in favor of petitioner); see also LaMere v. Slaughter, 458 F.3d 878, 882 (9th Cir. 2006) (in a case where both sides have presented evidence, a habeas court need not confine its analysis to evidence presented by the state in its case-in-chief).

As is true in state court, "it does not matter that other, perhaps equally reasonable conclusions might be drawn from the evidence," see supra at 12, n. 8, as long as the evidence supports a rational jury's finding of guilt beyond a reasonable doubt. Payne, 982 F.2d at 338. It does so here. The California Court of Appeal's rejection of Jordan's due process claim alleging insufficient evidence in support of the first degree murder conviction was not contrary to, or an unreasonable application of, clearly established federal law.

Accordingly, Jordan is not entitled to habeas relief based on this claim.

II.   Due process claims based on alleged errors in jury instructions

Jordan's several challenges to the jury instructions were summarized by the Court of Appeal:

> Jordan asserts that: (1) the trial court erred by instructing the jury on a legally inadequate theory of felony murder; (2) even if the instructions did not unambiguously convey a legally inadequate theory of felony murder, they were misleading and

---

[10] The court may not substitute its judgment for that of the jury. See Cavazos v. Smith, 132 S.Ct. 2, 3-4 (2011) (finding 9th Circuit erred by substituting its judgment for that of California jury on the question whether the prosecution's or defense's expert witnesses more persuasively explained the cause of death).

14

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

ambiguous with regard to whether appellants must have had the intent required as conconspirators in the Garvin robbery and to have been guilty of that robbery to be convicted of felony murder; (3) the trial court erred by refusing to instruct the jurors that they had to agree unanimously that appellants specifically conspired to commit the attempted robbery of Garvin to be found guilty of felony murders; (4) the trial court erred by failing to instruct the jurors sua sponte that appellants could not be convicted of felony murder unless they possessed the requisite intent and were guilty of the attempted robbery of Garvin; and (5) the trial court erred in giving CALCRIM No. 417 (Jan. 2006 ed.) because it may have misled the jury into thinking that the natural and probable consequences doctrine played a role in coconspirator liability for statutory felony murder.

Cal. Ct. App. Opinion, ¶. 23-24.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. 62, 72 (1991). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See id. In reviewing a faulty instruction, the court inquires whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. Id. at 72, n.4.

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. See Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing Henderson v. Kibbe, 431 U.S. 145, 155 (1977)). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S. at 155).

Even if there is an instructional error, a habeas petitioner is not entitled to relief unless the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)(quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted). If the court is convinced that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand. O'Neal v. McAninch, 513 U.S. 432, 437 (1995). Further, federal court's review of a claim of instructional error is subject to a highly deferential standard of review. Masoner v.

1   <u>Thurman</u>, 996 F.2d 1003, 1006 (9th Cir. 1993).

2

3            A.      <u>Failure to include all necessary elements</u>

4            Jordan first claims that the jury instruction with respect to the conspiracy to commit

5   robbery charge was inadequate because "the modified version of CALCRIM 540B given by the

6   trial court did not inform the jurors of all findings they must make to convict petitioner for first

7   degree murder as a co-conspirator in felony murder." Doc. 2 at 10.   Specifically, Jordan

8   contends that the instructions did not require the jury to find that Jordan agreed to the attempted

9   robbery of Garvin and that she specifically intended that the co-conspirators commit that

10  robbery.   Instead, the jury was required to make findings with respect to Jordan's intent to

11  commit the earlier robbery of Alston and Holmes to find her guilty of felony murder as a co-

12  conspirator.

13           According to the trial record, the prosecution set forth two theories of first degree murder

14  in this case: 1) malice aforethought as to the shooter, and aiding and abetting as to the co-

15  participants; and 2) felony murder.  Ans., Ex. B at 2194.  There is no dispute that the evidence

16  established that codefendant Green shot and killed Garvin.   With respect to Jordan and

17  codefendants Grady and Robinson, one of the instructions the trial court gave the jury on first

18  degree felony murder where a "coparticipant allegedly committed the fatal act" was a modified

19  version of CALCRIM 540B, which made clear to the jury that there existed three theories of

20  felony-murder liability for the non-shooters: (1) direct participation in the attempted robbery;

21  (2) aiding and abetting the attempted robbery; and (3) conspiracy to rob.  <u>Id.</u> at 2202-04.

22           According to respondent, California law provides that a non-shooter is not guilty under

23  the conspiracy to rob theory of felony murder liability unless she conspired to commit the

24  predicate crime - one of the felonies listed in California Penal Code § 189 (like robbery) during

25  which the commission of the killing occurred - and intended that one or more of the members

26  of the conspiracy commit that predicate crime. Ans. at 13-14 (citing <u>People v. Pulido</u>, 15 Cal.4th

27  713, 723 (1997) ("Our cases establishing the complicity of a nonkiller in a felony murder have

28  thus uniformly required, at a minimum, that the accomplice have been, at the time of the killing,

16

a conspirator or aider and abetter to the [section 189] felony"; 1 Witkins & Epstein, Cal. Criminal Law, Crimes against the Person, § 136, p. 751 (3d ed. 2000) (the felony murder doctrine is "frequently involved in conspiracy cases; e.g., all members of a conspiracy to commit robbery or burglary are guilty of murder if one of them kills in the commission of the crime"]).) Jordan claims that the "predicate crime" relevant to the conspiracy to rob theory was the attempted robbery of Garvin rather than the earlier robbery of Alston and Holmes, and that CALCRIM 540B, as given in this case, failed to require the jury to determine whether she specifically conspired to commit the attempted Garvin robbery and that she intended for her coconspirators to do so in order to find her guilty of felony murder.

The California Court of Appeal outlined the background of this jury instruction claim, and rejected it, as follows:

A.    *Standard of Review*

When we review a claim of instructional error, "we must consider the jury instructions as a whole, and not judge a single jury instruction in artificial isolation out of the context of the charge and the entire trial record." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.) Where, as here, an appellant claims that instructions are deficient, "[w]hat is crucial... is the meaning that the instructions *communicated to the jury*. If that meaning was not objectionable, the instructions cannot be deemed erroneous. [Citation.]" (*People v. Benson* (1990) 52 Cal.3d 754, 801.) We determine the correctness of jury instructions from the trial court's entire charge, and we must also consider the arguments of counsel in assessing the probable impact of the instructions on the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) Thus, the ultimate question is "whether there is a 'reasonable likelihood' that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of [the] trial and the arguments of counsel. [Citations.]" (*People v. Dieguez, supra,* at p. 276-77.)

B.    *The Instructions and Arguments of Counsel*

An understanding of the claimed instructional error requires us to set forth at some length the instructions at issue. In addition, we recount some of the arguments of counsel that bear on the claimed instructional error.

The trial counsel informed the jury that appellants and their codefendant, Grady, were "being prosecuted for murder under two theories: [¶] One, malice aforethought as to the perpetrator, and aiding and abetting as to the co-participants; and second theory, felony murder." As set forth in the factual background, the evidence showed that Green shot and killed Garvin, and that Robinson was physically present and participated directly in the attempted robbery. There was no evidence, and the prosecution did not argue, that Grady and Jordan were personally present at the time of the Garvin incident. As to Jordan, Robinson, and codefendant Grady, the trial court gave the jury a modified version of CALCRIM No. 540B (Jan. 2006 ed.) concerning first-degree felony murder where a "coparticipant allegedly committed the fatal act." The court instructed the jury:

1

2

"Defendants may also be guilty of murder under a theory of felony murder, even if another person did the act that resulted in the death. I will call the other person the perpetrator.

3

"To prove that a defendant is guilty of first-degree murder under this theory, the People must prove that:

4

5

"1.    A defendant attempted to commit robbery or aided and abetted the commission of attempted robbery, or was a member of a conspiracy to commit robbery;

6

7

"2.    A defendant intended to commit robbery, or intended to aid and abet the commission of a robbery, or intended that one or more of the members of the conspiracy commit robbery;

8

9

"3.    If the defendant did not personally commit attempted robbery, then a perpetrator personally committed attempted robbery; and

10

"4.    While committing attempted robbery, the perpetrator did an act that caused the death of another person;

11

12

"5.    There was a logical connection between the act causing the death and the attempted robbery. The connection between the fatal act and the attempted robbery must involve more than just their occurrence at the same time and place.

13

14

"A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent.

15

16

"To decide whether a defendant committed attempted robbery, a violation of Penal Code Section 664/212.5(c), please refer to the separate instructions that I have given you on that crime. You must apply those instructions when you decide whether the People have proved first-degree murder under this theory of felony murder.

17

18

"To decide whether a defendant aided and abetted the commission of robbery, please refer to the separate instructions that I have given you on aiding and abetting a crime. You must apply those instructions when you decide whether the People have proved first-degree murder under this theory of felony murder.

19

20

21

22

23

"To decide whether a defendant was a member of a conspiracy to commit robbery before the time of the act causing death, please refer to the instructions that I have given you on conspiracy. You must apply those instructions when you decide whether the People have proved first-degree murder under this theory of felony murder. However, you cannot convict a single – let me say again. However, you cannot convict a single defendant of first-degree felony murder on a theory of participation in a conspiracy to commit robbery unless you have found two or more defendants guilty of such a conspiracy.

24

25

"The defendant must have intended to commit robbery or aided and abetted the commission of robbery or have been a member of a conspiracy to commit robbery before or at the time of the act causing death.

26

27

"If you find that a defendant did not aid and abet or did not enter into a conspiracy to commit robbery until after the act which caused death of another person, then you must find such defendant not guilty of murder and not guilty of attempted robbery.

28

"It is not required that a defendant be present when the act causing death

**United States District Court**
For the Northern District of California

18

occurs."[11]

The trial court explained that "[t]he defendants are charged in Count Five with conspiracy to commit robbery." Having told the jury to refer to the instructions on conspiracy to determine "whether a defendant was a member of a conspiracy to commit robbery before the time of the act causing death," the trial court also gave the jury a slightly modified version of CALCRIM No. 415 (Jan. 2006 ed.). It instructed the jury: "To prove that a defendant is guilty of this crime [conspiracy], the People must prove that: [¶] 1. A defendant intended to agree and did agree with one or more of the other defendants to commit robbery; [¶] 2. At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit robbery; [¶] 3. One of the defendants, or both of them, or all of them, committed at least one of the alleged overt acts to accomplish robbery; and [¶] 4. At least one of the overt acts was committed in California." The jury was further instructed that "An overt act is an act by one or more members of the conspiracy that is done to help accomplish the agreed-upon crime." The court went on to list seven overt acts alleged in the information, the last two of which were "Greshinal Green shot Carlos Garvin with the Smith & Wesson .38 caliber revolver in front of 145 Taylor Street on May 14th, 2005" and "Greshinal Green reached into Carlos Garvin's pockets in front of 145 Taylor Street on May 14th, 2005."

In closing argument, the prosecutor stressed that the defendants were engaged in a single conspiracy to commit robber*ies*, a conspiracy that included the robberies of Alston, Holmes, and Garvin.[12] For example, after discussing the robberies of Alston and Holmes, the prosecutor told the jury: "You go forward in our conspiracy because it doesn't stop, the conspiracy to rob these targets in San Francisco doesn't stop. Because we know, based on our evidence presented in our courtroom, that Greshinal Green and Lenora Robinson approached Carlos Garvin, prevented him from leaving,... revolver is pulled, the very same revolver that was used on Mr. Alston and Mr. Holmes. [¶]... [¶] How do we know that the robbery conspiracy was continuing? Because Mr. Green rifled Carlos' pockets." The prosecutor also referred to "this overall conspiracy [to] commit robberies here in San Francisco that night...." Later in his closing, he called it "a conspiracy to rob folks in San Francisco" and specifically argued that the Garvin attempted robbery was part of that conspiracy. After discussing the attempted robbery and murder of Garvin, the prosecutor argued pointedly to the jury that Jordan was a member of the conspiracy at the time Garvin was killed: "There was no doubt that *still part of the conspiracy, Anissa Jordan was in Mr. Grady's car when Carlos Garvin was shot*. Why is that important? Because only two folks' DNA is on this gun, Anissa Jordan, Greshinal Green, nobody else." (Italics added.)

C.     *The Instructions Were Neither Inadequate Nor Misleading*

A defendant may only be guilty of felony murder under a coconspirator liability theory if the defendant conspired to commit the predicate felony during which the killing occurred and intended that one or more members of the conspiracy commit the predicate felony. (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1158-1159; *People v. Pulido* (1997) 15 Cal.4th 713, 723.) Jordan contends that CALCRIM No. 540B did not explain to the jury that conviction for felony murder under a coconspirator liability theory required an intent to commit the underlying felony (here, the attempted robbery of

---

[11] As Jordan noted in her brief, her trial counsel made no objection to this instruction.

[12] Jordan acknowledged in her opening brief that "the prosecutor argued that a general conspiracy to commit robbery was the factual underpinning for the murder charge...."

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   Garvin) and that no other instructions filled that gap.

2         We disagree. As the United States Supreme Court has observed, "[j]urors do not
3   sit in solitary isolation booths parsing instructions for subtle shades of meaning in the
    same way that lawyers might. Differences among them in interpretation of instructions
4   may be thrashed out in the deliberative process, with commonsense understanding of the
    instructions in the light of all that has taken place at the trial likely to prevail over
5   technical hairsplitting." (*Boyde v. California* (1990) 494 U.S. 370, 380-81.) Reviewing
    the instructions given in the context of the entire trial record and the arguments of counsel
6   (*People v. Dieguez, supra,* 89 Cal.App.4th at p. 576), we conclude that there is no
    reasonable likelihood that the jurors would have concluded that they could convict Jordan
7   of felony murder under a coconspirator liability theory without finding that she was part
    of a conspiracy to commit the attempted robbery of Garvin and intended that one or more
8   of her confederates commit that attempted robbery. The final three elements of
    CALCRIM No. 540B as read to the jury provided: "3. If the defendant did not personally
9   commit attempted robbery, then a perpetrator personally committed attempted robbery;
    and [¶] 4. While committing attempted robbery, the perpetrator did an act that caused the
10  death of another person; [¶] 5. There was a logical connection between the act causing
    the death and the attempted robbery." From this, the jury would have understood that to
11  find Jordan guilty of felony murder under a coconspirator liability theory, it would have
    to find that she was a member of a conspiracy to commit the attempted robbery of Garvin.

12        In addition, the trial court instructed the jurors to refer to the conspiracy
13  instructions to determine "whether a defendant was a member of a conspiracy to commit
    robbery before the time of the act causing death...." CALCRIM No. 415 informed the jury
14  that the defendants were charged with conspiracy to commit robbery and the court listed
    Green's shooting of Garvin and his reaching into Garvin's pockets as two of the possible
15  overt acts they might find in furtherance of the overall conspiracy. The instructions thus
    made plain that the attempted robbery of Garvin was part of the single overall conspiracy
16  with which appellants were charged. We presume that the jury was capable of
    understanding and correlating both the instructions on felony murder and the instructions
17  on conspiracy. (E.g., *People v. Sanchez* (2001) 26 Cal.4th 834, 852.) When it did so, the
    jury would have understood that to convict Jordan of felony murder as a coconspirator,
18  it would have to find (1) that she intended to agree and did agree with one or more of her
    codefendants to commit robberies that included the attempt to rob Garvin and (2) that she
19  intended that one or more of her codefendants would commit that robbery. Finally, the
    jury did find that codefendant Green's actions in shooting Garvin, and in reaching into
20  his pockets following the shooting, were overt acts in support of the conspiracy and were
    done to "help accomplish the agreed-upon crime." After hearing and reading the
21  instructions as a whole, it is not reasonably likely the jury could have concluded, as
    Jordan argues, that it could convict her of the murder of Garvin solely by finding that she
22  was a member of a conspiracy to rob Alston and Holmes.

23  Cal. Ct. App. Opinion, ¶. 24-30 (footnotes renumbered).

24        The state appellate court's decision was consistent with Supreme Court precedent in

25  judging the instructions not in artificial isolation but in the context of the instructions as a whole

26  and the trial record. See supra at 17 (citing People v. Dieguez, 89 Cal.App.4th at 276); see

27  Estelle, 502 U.S. at 72. Contrary to Jordan's claims, it is clear that in the context of the

28  instructions as a whole, there was no reasonable likelihood that the jury found Jordan guilty of

United States District Court
For the Northern District of California

felony murder based on inadequate findings.  First of all, the jury would have understood the consistent reference to "defendant" as including Jordan.  As pointed out by the state appellate court, the jury was read instructions that included the last three elements of CALCRIM No. 540B: "3. If the defendant did not personally commit attempted robbery, then a perpetrator personally committed attempted robbery; and [¶] 4. While committing attempted robbery, the perpetrator did an act that caused the death of another person; [¶] 5. There was a logical connection between the act causing the death and the attempted robbery."  See supra at 20-21. The Court agrees with the state appellate court's conclusion that from these instructions, the jury would have understood that to find a "defendant," i.e., Jordan, guilty of felony murder under a coconspirator liability theory, "it would have to find that she was a member of a conspiracy to commit the attempted robbery of Garvin." Id. at 21.  Jordan's claim that the "predicate crime" relevant to the conspiracy to rob theory was only the attempted robbery of Garvin, rather than the earlier robbery of Alston and Holmes, is incorrect; rather, the "predicate crime" was the conspiracy to commit several robberies that night, which included the robberies of Alston, Holmes, and Garvin.  The prosecution stressed repeatedly in closing argument that the defendants were engaged in a single conspiracy to commit more than one robbery that evening, describing the conspiracy as "this overall conspiracy [to] commit robberies here in San Francisco that night..." and "a conspiracy to rob folks in San Francisco."  Id. at 20.  As discussed in Jordan's first claim, there was sufficient evidence for the jury to reasonably conclude that Jordan had the necessary specific intent to conspire to commit multiple robberies that night: "Jordan was not only aware that another robbery would be committed, but that she agreed that it would be committed and intended that her accomplices commit it." Id. at 14.  Jordan's claim that the jury instructions with respect to the conspiracy to commit robbery charge was inadequate is without merit, and she is not entitled to habeas relief on this claim.

    B.    Instructions were misleading and ambiguous

        Alternatively, Jordan claims that even if the instructions were not inadequate for the reasons discussed above, they were nevertheless unconstitutional as misleading and ambiguous.

United States District Court
For the Northern District of California

In rejecting Jordan's opening claim attacking the adequacy of the instructions as discussed above, the Court of Appeal also rejected any notion that the instructions were misleading and ambiguous: "The instructions thus made plain that the attempted robbery of Garvin was part of the single overall conspiracy with which appellants were charged. We presume that the jury was capable of understanding and correlating both the instructions on felony murder and the instructions on conspiracy." See supra at 20.

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. See Estelle v. McGuire, 502 U.S. at 72 & n.4; Boyde v. California, 494 U.S. 370, 380 (1990). In order to show a due process violation, the defendant must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt. Waddington v. Sarausad, 555 U.S. 179, 190-191 (2009) (internal quotations and citations omitted).

Jordan's claim fails because she fails to show that the instructions were both ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that violates the Constitution. There was no ambiguity with respect to the elements that the jury would have to find in order to convict Jordan of felony murder as a coconspirator. As the Court of Appeal found, the jury would have understood based on the instructions it was given that it would have to find: "(1) that [Jordan] intended to agree and did agree with one or more of her codefendants to commit robberies that included the attempt to rob Garvin and (2) that she intended that one or more of her codefendants would commit that robbery." See supra at 20. Furthermore, the jury found that "codefendant Green's actions in shooting Garvin, and in reaching into his pockets following the shooting, were overt acts in support of the conspiracy and were done to 'help accomplish the agreed-upon crime.'" Id. The Court of Appeal reasonably concluded that "[a]fter hearing and reading the instructions as a whole, it is not reasonably likely the jury could have concluded, as Jordan argues, that it could convict her of the murder of Garvin

solely by finding that she was a member of a conspiracy to rob Alston and Holmes." The Court

finds no merit to Jordan's claim that the instructions were misleading and ambiguous. Jordan

is not entitled to habeas relief on this claim.


C.     Failure to include instruction on unanimous verdict

Jordan next claims that the trial court erred in refusing to give an instruction that the jury

must agree unanimously on all the facts required for coconspirator liability in felony murder.

The California Court of Appeal rejected this claim as well:

> For similar reasons, we reject Jordan's argument that the trial court erred in refusing to instruct the jury that it must unanimously agree that she conspired to commit an attempted robbery of Garvin before she could be found guilty of felony murder as a coconspirator. We note first that no such instruction was requested below. Instead, Jordan's trial counsel simply joined in an objection by Grady's counsel that the jury should be required to agree on one overt act. And as we have explained above, it is not reasonably likely the jury could have read the instructions on felony murder and conspiracy together and have concluded that it could convict Jordan of felony murder without agreeing that she had conspired to commit *both* the Alston/Holmes robberies *and* the attempted robbery of Garvin.

Cal. Ct. App. Opinion, p. 30 (original emphasis).

Jordan claims in her petition that the Court of Appeal was incorrect in its conclusion:

> Contrary to the Court of Appeal's opinion, in light of the non-unanimity instruction, the conspiracy conviction demonstrates only that the jurors found that petitioner conspired to commit the crime of robbery and that at least one juror found an overt act relating to Garvin, but not that any jurors *agreed* that the Garvin attempted robbery (as distinct from the robberies of Alston and Holmes) was an object of the conspiracy.... In other words, nothing in the conspiracy instructions required that the jurors agree that count two [the attempted robbery of Garvin] was an object of the conspiracy or that the jurors make the requisite findings of specific intent and agreement for co-conspirator liability of petitioner in the alleged felony murder of Carlos Gavin.

Doc. 2 at 17-18 (original emphasis).

Jordan's argument is unpersuasive. The Court of Appeal was not unreasonable to

conclude that the jury, in reading the instructions on felony murder and conspiracy together,

would have concluded that it could not convict Jordan of felony murder without agreeing that

she intended to conspire to commit multiples robberies that night, and that she intended to aid

and abet the commission of the robberies or that she intended that other members of the

conspiracy commit the robberies, which included the Alston/Holmes robberies and the attempted

United States District Court
For the Northern District of California

robbery of Garvin.  The jury was not required to find separate intent to conspire for *each* robbery, but rather that Jordan was part of a single ongoing conspiracy to commit several robberies during the course of the evening.  It is clear from the instructions taken as a whole and the prosecution's repeated references in closing argument to a "single conspiracy" that the jury would have understood that for co-conspirator felony murder liability to attach to Jordan that they had to find that she was a member of a single conspiracy to commit the robberies of Alston/Holmes *and* Garvin, and not just the former.  This claim is without merit, and does not warrant habeas relief.

D.     Jury instructions with respect to "natural and probable consequences theory of liability"

Jordan claims that the trial court erred by giving CALCRIM 417 because the instruction led the jurors to believe that the natural and probable consequences doctrine of liability applied to co-conspirator liability in felony murder.

The California Court of Appeal denied this claim as being forfeited:

> Jordan, joined by Robinson, argues that the trial court violated her federal constitutional rights to due process and jury trial by instructing the jury on CALCRIM No. 417. The basis of this claim is Jordan's view that CALCRIM No. 417 may have led the jury to conclude that the natural and probable consequences doctrine played a role in coconspirator liability for felony murder. As Jordan explains, "the jurors may have concluded that appellant could be guilty of felony murder if she conspired to commit the Alston/Homes robbery and the *attempted robbery* and/or *felony murder* - commission of an act causing death during the attempted robbery - was a natural and probable consequence of the agreed upon Alston/Holmes robbery."
>
> In the trial court, however, when defense counsel were asked whether they objected to CALCRIM No. 417 as written, no one raised the objection that Jordan now presents on appeal. Instead, counsel for Grady stated that she had put her objections on the record and continued, "I think there's two conspiracies. I think the jury should be required to agree on one overt act." Jordan's trial counsel joined in that objection without more. Having failed to raise this claim below, Jordan may not now assert it on appeal. (See, e.g., *People v. Stitely* (2005) 35 Cal.4th 514, 546; 1 Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2008) ¶ 8:229, p. 8-155.)

Cal. Ct. App. Opinion, p. 31.

Respondent argues that the Court of Appeal's rejection of this claim was based on an independent and adequate state ground barring relief which bars federal habeas review of the

United States District Court
For the Northern District of California

claim. Specifically, respondent contends that California's failure-to-object procedural bar has long been deemed adequate to prohibit federal habeas review of the claim at issue. Ans. at 25, citing <u>Hines v. Enomoto</u>, 658 F.2d 667, 673 (9th Cir. 1981); <u>Bonin v. Calderon</u>, 59 F.3d 815, 842-43 (9th Cir. 1995).

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-30 (1991). In the context of direct review by the United States Supreme Court, the "adequate and independent state ground" doctrine goes to jurisdiction; in federal habeas cases, in whatever court, it is a matter of comity and federalism. <u>Id.</u> The procedural default rule is a specific instance of the more general "adequate and independent state grounds" doctrine. <u>Wells v. Maass</u>, 28 F.3d 1005, 1008 (9th Cir. 1994).

Despite Jordan's arguments to the contrary, it is clear that her failure to object at trial to CALCRIM No. 417 bars this Court from reviewing the claim. The Ninth Circuit has recognized and applied the California contemporaneous objection rule in affirming denial of a federal petition on grounds of procedural default where there was a complete failure to object at trial. <u>See</u> <u>Inthavong v. Lamarque</u>, 420 F.3d 1055, 1058 (9th Cir. 2005) (holding petitioner barred from challenging admission of evidence for failure to object at trial); <u>Paulino v. Castro</u>, 371 F.3d 1083, 1092-93 (9th Cir. 2004) ((holding petitioner barred from challenging jury instruction for failure to object at trial); <u>Vansickel v. White</u>, 166 F.3d 953, 957-58 (9th Cir. 1999) (holding petitioner barred from challenging denial of peremptory challenges for failure to contemporaneously object). The state appellate court found that when defense counsel were asked if they objected to CALCRIM No. 417 as written, no one raised an objection. <u>See</u> <u>supra</u> at 25. This claim is procedurally defaulted, and because Jordan has not shown cause and prejudice or a miscarriage of justice, <u>see</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991), it is barred.

E.      Harmless error

The Court of Appeal found that even if the instructions were flawed, Jordan was nevertheless not entitled to relief because the errors were harmless:

> Even if we agree with Jordan's claims that the instructions were erroneous, we would conclude that any such error was harmless. [FN.15 – On April 7, 2009, at the request of Jordan's counsel, we permitted supplemental briefing assessing the effect of the California Supreme Court's recent decision in *People v. Chun* (2009) 45 Cal.4th 1172 on whether the instructional errors claimed by Jordan are harmless.] In *People v. Chun*, *supra*, anther felony-murder case, our high court explained that one way a reviewing court may find an instructional error harmless beyond a reasonable doubt is by relying on other portions of the jury's verdict that demonstrate that the jury employed a legally valid theory to convict the defendant. (*People v. Chun*, *supra*, 45 Cal.4th at p. 1203.) It noted, however, that is not the only way to do so. (*Ibid*.) It also found that a test stated by Justice Scalia in his concurring opinion in *California v. Roy* (1996) 519 U.S. 2 "is adaptable to the reasonable doubt standard of direct review." (*People v. Chun*, *supra*, at p. 1204.) Quoting Justice Scalia, the California Supreme Court set forth the test: "'The error in the present case can be harmless only if the verdict on other points effectively embraces this one or if it is impossible, upon the evidence, to have found what the verdict *did* find without finding this point as well.'" (*Ibid*., quoting *California v. Roy*, *supra*, at p. 7 (conc. opn. of Scalia, J.).) Put another way, "[i]f other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary for [a valid theory of murder,] the erroneous felony-murder instruction was harmless." (*People v. Chun*, *supra*, 45 Cal.4th at p. 1205.)
>
> We conclude that the record before us leaves no doubt that the jury made the findings Jordan claims were omitted by the allegedly erroneous CALCRIM No. 540B. That is, we are convinced that the jury found that (1) the attempted robbery of Garvin was an object of the conspiracy of which Jordan was a part, and (2) she intended that one or more members of the conspiracy commit the attempted robbery of Garvin. First, the jury convicted Jordan of the conspiracy charged in count 5. That conviction required the jury to find that Jordan: (1) intended to agree and did agree with one or more of the other defendants to commit robbery; (2) at the time of the agreement, Jordan and one or more of the other alleged members of the conspiracy intended that one of them would commit robbery; and (3) one or more of the defendants committed at least one of the alleged overt acts to accomplish robbery. (CALCRIM No. 415.) Second, as we have explained above, the conspiracy to rob charged in count 5 of the information included the attempted robbery of Garvin, and the final two overt acts listed, which the jury found true, were Green's shooting of Garvin and his reaching into Garvin's pockets. The prosecutor emphasized during closing argument that the defendants were engaged in a *single* conspiracy to rob and specifically argued that Jordan was a member of the still-ongoing conspiracy when Garvin was killed. [FN. 16 – When the trial court and counsel discussed proposed jury instructions, counsel for Grady contended that "this is a case where two discrete conspiracies are alleged." She asserted that the robberies of Alston and Holmes were the subject of one conspiracy, and the attempted robbery of Garvin was the subject of another. She expressed the view that the prosecutor would argue that there were two discrete conspiracies. The prosecutor stated that he did not intend to so argue, and the trial court agreed that only one conspiracy was charged. In his closing argument, the prosecutor argued

that there was a single conspiracy, and that the felony murder of Garvin resulted from an attempted robbery in furtherance of that conspiracy.] And as we make clear in the following section of this opinion, there was ample evidence to support the jury's finding of Jordan's participation in that conspiracy. Thus, the jury convicted Jordan of involvement in a conspiracy that, according to the charges, evidence, and argument, included the attempted robbery of Garvin.

In addressing the effect of the harmless error analysis adopted in *People v. Chun*, Jordan repeats the argument made in her opening brief that the instructions permitted the jury to find her guilty of murder if they found that she conspired to commit the Alston/Holmes robberies; that she knew that Green, her coconspirator in those robberies, would commit another robbery or was likely to do so; that Green committed the count 2 attempted robbery; and that there was a logical connection between the act causing death and the Garvin attempted robbery. But her supplemental brief does not come to grips with the jury's finding that she was guilty of a single conspiracy to rob, and that at least two of the overt acts in furtherance of that conspiracy directly involved the attempted robbery and shooting of Garvin. Nor does it address why her conviction of a single conspiracy to rob embracing the robberies of Alston and Holmes, as well as the attempted robbery of Garvin, would not demonstrate that the jury made the findings necessary to convict her on a valid theory of coconspirator felony-murder liability.

In sum, we conclude that "other aspects of the verdict or the evidence leave no reasonable doubt" that the jury found that Jordan conspired to commit the attempted robbery of Garvin charged in count 2 and that she intended for one or more members to commit the robbery of Garvin. (See *People v. Chun*, *supra*, 45 Cal.4th at p. 1205.) Thus, even if we found the challenged instructions erroneous (which we do not), we would still find the error harmless beyond a reasonable doubt.

Cal. Ct. App. Opinion, ¶. 32-35.

Even if there were constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict. Brecht, 507 U.S. at 637. In this case, where the jury convicted Jordan based on ample evidence of her participation in a single, ongoing conspiracy that, according to the charges, evidence, and argument, included the attempted robbery of Garvin, any error was harmless. The state appellate court's rejection of Jordan's jury instruction claims was not contrary to, or an unreasonable application of, clearly established Supreme Court authority.

III.   Due process claim for failure to instruct on defense theory

Jordan next claims that the trial court violated her Sixth and Fourteenth Amendment rights when it refused to instruct on her defense theory, that is, "by refusing to instruct that the

**United States District Court**
For the Northern District of California

jurors must unanimously agree that Petitioner conspired to commit the attempted robbery of Carlos Garvin charged in count two in order to find her guilty of felony murder as a co-conspirator." Doc. 2 at 25. It appears that defense counsel's strategy was to argue that there were potentially two conspiracies charged as one and that the prosecution's felony murder theory was connected to the "second" conspiracy. The trial court denied the request as there was only one conspiracy charge. Jordan argues that the trial court's denial foreclosed the defense "from obtaining a correct instruction that if the jurors did not unanimously agree that petitioner conspired to commit the count two attempted robbery of Carlos Garvin - if they did not agree that it was an object of the conspiracy - they could not find her guilty of felony murder as a coconspirator." Doc. 2 at 25-26. This claim is similar to Jordan's earlier claim that the trial court erred in refusing to give an instruction that the jury must agree unanimously on all the facts required for coconspirator liability in felony murder. <u>See</u> <u>supra</u> at 23-24. As discussed above, the California Court of Appeal rejected that claim:

> For similar reasons, we reject Jordan's argument that the trial court erred in refusing to instruct the jury that it must unanimously agree that she conspired to commit an attempted robbery of Garvin before she could be found guilty of felony murder as a coconspirator. We note first that no such instruction was requested below. Instead, Jordan's trial counsel simply joined in an objection by Grady's counsel that the jury should be required to agree on one overt act. And as we have explained above, it is not reasonably likely the jury could have read the instructions on felony murder and conspiracy together and have concluded that it could convict Jordan of felony murder without agreeing that she had conspired to commit *both* the Alston/Holmes robberies *and* the attempted robbery of Garvin.

Cal. Ct. App. Opinion, p. 30 (original emphasis).

The state appellate court noted that no such instruction was actually requested. Jordan states in her petition that although defense counsel "might have articulated their specific requests more clearly," they nevertheless alerted the trial court to their concern that, "in light of the potential that there was more than one conspiracy charged in one count, the instructions opened petitioner up to additional punishment under a felony murder theory without adequate, agreed-upon findings that the object of the conspiracy was that required for felony murder." Doc. 2 at 25. However, the state appellate court found that it was not reasonably likely that the jury could have read the instructions as a whole and concluded that it could convict Jordan of felony murder

United States District Court
For the Northern District of California

without agreeing "that she had conspired to commit *both* the Alston/Holmes robberies *and* the attempted robbery of Garvin." As this Court noted several times in previous discussions, the prosecution emphasized in closing that there was a single ongoing conspiracy, and that the evidence supported the jury's finding that Jordan intended to participate in the conspiracy from beginning to end. The state court's determination was not an unreasonable application of Supreme Court precedent nor was it based on an unreasonable determination of the facts in light of the evidence presented, which included all the instructions given and the arguments of counsel. 28 U.S.C. § 2254(d).

IV.     Ineffective assistance of counsel

Jordan's last two claims allege that her counsel rendered ineffective assistance for failing to make sufficient argument on jury instructions and for failing to object to CALCRIM No. 417.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, she must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, she must establish that she was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.

The Court of Appeal rejected Jordan's claim that her counsel provided ineffective assistance for failing to make a sufficient request for jury instructions on unanimity:

> We disagree with Jordan's claim that her trial counsel was ineffective for failing to request an instruction that the jury must unanimously agree that she conspired to commit the attempted robbery of Garvin before she could be found guilty of felony murder as a coconspirator. As explained above, on direct appeal, we may not reverse a conviction on the grounds of ineffective assistance of counsel unless the record affirmatively discloses that counsel had no rational tactical purpose for the act or omission in question. (*People v. Jones*, *supra*, 29 Cal.4th at p. 1254.) Where the record sheds no light on the issue, we must affirm unless there could be no conceivable reason for counsel's act or omission. (*Ibid.*) Moreover, even if, after our review of the record, "we have serious doubt that a satisfactory explanation could be provided, (but) we are unable to conclude that it could not," we must reject an ineffective assistance of counsel

United States District Court
For the Northern District of California

1    claim. (*People v. Ledesma*, *supra*, 43 Cal.3d at p. 218.)

2         Here, her attorney did not explain why he did not request the instruction Jordan
     now seeks. He may not have requested it because he concluded, as we have, that the
3    instructions were adequate. Since the record sheds no light on why counsel failed to
     request the instruction, and we cannot say that no satisfactory explanation could be
4    provided, we must reject Jordan's claim. (See *People v. Jones*, *supra*, 29 Cal.4th at p.
     1254; *People v. Ledesma*, *supra*, 43 Cal.3d at p. 218.)
5
     Cal. Ct. App. Opinion, ¶. 31-32.
6
          Here, this Court finds no basis for disturbing the conclusion of the state appellate court.
7
     Even assuming that counsel was deficient for failing to request the specific instruction at issue,
8
     Jordan cannot show that she was prejudiced by it.  A defendant must show that counsel's errors
9
     were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
10
     Strickland, 466 U.S. at 688.  The test for prejudice is not outcome-determinative, i.e., defendant
11
     need not show that the deficient conduct more likely than not altered the outcome of the case;
12
     however, a simple showing that the defense was impaired is also not sufficient.  Id. at 693.  The
13
     defendant must show that there is a reasonable probability that, but for counsel's unprofessional
14
     errors, the result of the proceeding would have been different; a reasonable probability is a
15
     probability sufficient to undermine confidence in the outcome.  Id. at 694.  As discussed in the
16
     review of the numerous jury instruction claims above, the state appellate court was not
17
     unreasonable for concluding that there was no error, and that furthermore, the alleged errors
18
     were likely harmless.  See supra at 28.  Based upon a review of the instructions presented at the
19
     trial as a whole and the arguments presented by the prosecution, it cannot be said that the jury
20
     would have come to a different verdict if they had been required to unanimously agree that
21
     Jordan conspired to commit the attempted robbery of Garvin before she could be found guilty
22
     of felony murder as a coconspirator.  There was ample evidence to support the finding that
23
     Jordan agreed to a single, ongoing conspiracy to commit several robberies that night, including
24
     the Alston/Holmes robberies and the attempted Garvin robbery.  Jordan has failed to show that
25
     but for counsel's error, the outcome of the trial would have been different.
26
          The Court of Appeal also denied Jordan's second ineffective assistance of counsel claim:
27
          To the extent Jordan's claim of ineffective assistance of counsel is based on her
28        attorney's failure to object to the giving of CALCRIM No. 417, we again conclude that

                                            30

1

2

3

4

Jordan has failed to meet her burden of showing that her counsel was ineffective. (*People v. Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.) The record does not reveal why he made no such objection, but he may simply have believed that the jury would understand that the natural and probable consequences doctrine could not substitute for the findings required by CALCRIM No. 540B. In addition, counsel may have assumed that the jury would understand from the trial court's instructions that CALCRIM No. 417 applied to the count 5 conspiracy charge, rather than to the count 1 murder charge.

Cal. Ct. App. Opinion, p. 32.

5

6

7

The following CALCRIM No. 417, "Liability for Conconspirator's Acts," was given to the jury at trial:

8

A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime.

9

10

11

12

A member of the conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. This rule applies even if the act was not intended as part of the original plan. Under this rule, defendant who is a member of the conspiracy does not need to be present at the time of the act.

13

14

A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

15

16

A member of the conspiracy is not criminally responsible for the act of another member if that act does not further the common plan or is not a natural and probable consequence of the common plan.

17

18

19

20

To prove that a defendant is guilty of the crime charged in Count 5 [conspiracy], the People must prove that:
1. The defendant conspired to commit the following crime: robbery;
2. A member of the conspiracy committed robbery to further the conspiracy; AND
3. Robbery was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit. The defendant is not responsible for the acts of another person who was not a member of the conspiracy even if the acts of the other person helped accomplish the goal of the conspiracy.

21

22

A conspiracy member is not responsible for the acts of other conspiracy members that are done after the goal of the conspiracy as been accomplished.

23

Rep.'s Tr. 2186-87.

24

25

26

27

28

In support of her claim, Jordan provides defense counsel's declaration in which he acknowledges that it was an oversight on his part for failing to object to CALCRIM No. 417. Specifically, counsel states that, "If I needed to make any arguments or objections in addition to those I made at trial in order to alert the trial court that I believed this version of CALCRIM 417 was erroneous and should not be given because the prosecutor was not relying on a natural

United States District Court
For the Northern District of California

and probable consequences theory of conspiracy liability, it could only have been an oversight on my part not to make those additional arguments." Doc. 33, Ex. A at 6.  However, assuming that counsel's performance was deficient, Jordan must still show prejudice, i.e., but for such error, the result of the trial would have been different.  <u>Strickland</u>, 466 U.S. at 694.  It is undisputed that the prosecution did not rely on nor set forth any arguments to the jury of conspiracy liability based on natural and probable consequences.  Rather, the prosecution emphasized Jordan's liability under felony murder for her part in the conspiracy.  It is therefore reasonably likely that the jury followed the instructions under CALCRIM No. 540B – which set forth the first-degree felony murder doctrine where a coparticipant committed the fatal act – in finding Jordan guilty of felony murder.  As respondent points out, the remainder of the instructions did not allow for the natural and probable consequences doctrine to substitute for the necessary findings under CALCRIM No. 540B.  Ans. at 35.  The Court is therefore not convinced that CALCRIM No. 417 so misled or confused the jury as to undermine confidence in the outcome of the trial.  <u>Strickland</u>, 466 U.S. at 694.  Furthermore, even if counsel had not erred and properly objected to CALCRIM No. 417 such that it was not given to the jury, there was nevertheless sufficient evidence for the jury to convict under the remaining instructions as a whole.

Accordingly, the state appellate court's rejection of these claims was not contrary to, or an unreasonable application of, clearly established Supreme Court authority.  Neither of these ineffective assistance of counsel claims therefore cannot serve as a basis for habeas relief.

///

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is DENIED.  A certificate of appealability will not issue.  Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). Jordan may seek a certificate of appealability from the Ninth Circuit Court of Appeals.  The clerk shall enter judgment in favor of respondent, and close the file.

IT IS SO ORDERED.

DATED: July 9, 2012

_____
SUSAN ILLSTON
United States District Judge